**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| EARNEST O. SMITH, | ) | CASE NO:    3:09 CV 470 |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| DAVID BOBBY, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |

This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2.  Petitioner, Earnest O. Smith, ("Smith"), challenges the constitutionality of his conviction in the case of *State v. Smith*, Case No. CR05-01293, Lucas County, Ohio Court of Common Pleas.  Smith filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on March 2, 2009 in the United States District Court for the Northern District of Ohio.  (Doc. 1.)  For the reasons set forth below, the Magistrate Judge recommends the petition be **DENIED**.

## I.  STATEMENT OF THE FACTS

The Lucas County Court of Appeals of Ohio, Sixth District, set forth the facts of this case on direct appeal in Case No. L-05-1350.  These binding factual findings "shall

be presumed to be correct," and Smith has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998); *Tyler v. Mitchell*, 416 F.3d 500 (6th Cir. 2005).

On February 11, 2005, appellant was indicted and charged with aggravated murder with a firearm specification and aggravated robbery with a firearm specification. The indictment resulted from actions allegedly taken by appellant, Cathy Barnett and Dennis J. Smith in the early morning hours of January 3, 2005, which led to the death of James Dillingham. Appellant had been apprehended in Nashville, Tennessee in late January 2005. He was then transported to Toledo, Ohio, arriving in the early morning of February 5, 2005. After his arrival, Officer Michael Riddle, of the Toledo Police Department, interviewed appellant on two occasions, February 5 and February 7. As a result of incriminating statements that appellant made during these interviews, as well as other evidence gathered in the case, appellant was charged as noted above. Thereafter, appellant filed a motion to suppress the statements he made during those interviews. The lower court denied the motion after a hearing on the matter, and the case proceeded to a jury trial at which the following evidence was submitted.

James Dillingham had been a driver for the Childer's Limousine Service in Toledo, Ohio. On the afternoon of January 2, 2005, he went to the Upper Deck Bar on Laskey Road in Toledo, with his friend and roommate Kenneth Northrup. Dillingham had recently cashed his paycheck of approximately $1,400 and was spending money freely at the bar, buying rounds of drinks for everyone in the bar. Dillingham also had a penchant for crack cocaine and Prostitutes, and after spending the afternoon and early evening at the bar, he decided to leave in pursuit of both. Because Northrup disapproved of Dillingham's use of both and would not allow him to use drugs or engage the services of a prostitute in his home, Dillingham would often spend the night in one of several local hotels, including the Crown Inn near the intersection of Jackman and Alexis Roads in Toledo. Dillingham then called his coworker, Roman Avila, who met up with Dillingham at Northrup's home and drove Dillingham to the Crown Inn in Dillingham's car. Avila then registered for the room, Room 25, in his own name, bought beer and a Molson-type beverage for Dillingham and then got a ride home with his brother.

At approximately 2:00 the next morning, David Simmons was driving home from a bar when his car broke down on Jackman Road. He pulled his car into the parking lot of a dialysis center next to the Crown Inn. After he determined that his car would not work, Simmons called his mother, who arrived at around 2:30

a.m. Shortly thereafter, as they were getting ready to leave, they heard a male voice yell "help me."  They then heard a loud bang and then once more heard the voice say "help me." Simmons' mother then called 911.  They then noticed a white minivan exit the Crown Inn parking lot. Simmons testified that the driver came to a stop, looked for traffic, then turned right onto Jackman Road, heading south. Simmons could not tell if the driver was male or female and stated that he only saw one person, the driver, in the van.  He further testified that only one and one-half minutes passed between the time he heard the cries for help and the van exited the parking lot.

Officer Debra Baker of the Toledo Police Department was the first officer to arrive on the scene.  As she investigated the Crown Inn parking lot, she discovered Dillingham's body lying on the sidewalk just outside of Room 25, between the door to the room and his car, that had been parked outside of the room.  She then investigated Room 25.  After determining that there were no other victims or suspects in the room, Baker secured the crime scene.  Baker testified that the scene looked as though there had been a struggle in Room 25 and that there appeared to be blood stains on the wall and bed. Baker also noticed coins on the floor.  Shortly thereafter, additional police personnel arrived and took over the crime scene.

Officer Gerald Schriefer, a detective with the Scientific Investigation Unit ("SIU") of the Toledo Police Department, arrived to process the crime scene.  Dillingham was lying on his back on the sidewalk in front of the door to Room 25. His face was covered in blood.  There was also a blood trail leading from the bed to the victim, with blood smears on the bedspread, a blood smear on the wall by the bed and blood drops on the carpet.  From the injuries to the victim's face, Schriefer believed that there had been a struggle, although not a "brawl."  In processing the room, Schriefer found money totaling $89.12 on the floor and by the victim, an extractor rod from a revolver on the floor, empty Smirnoff beverage bottles, empty Bud Light beer bottles, a brown leather gun holster, a piece of notepad paper with the name Cathy and phone number on it, and a piece of glass pipe commonly known as a crack pipe.  Schriefer processed the evidence for fingerprints and only found prints matching the victim.

Dr. Cynthia Beisser, a forensic pathologist in the Lucas County Coroner's Office, performed the autopsy on the body of James Dillingham and testified at the trial below. Beisser testified that Dillingham was five feet eleven inches tall and weighed 358 pounds.  She stated that Dillingham had sustained blunt-force trauma to his head, as shown by lacerations on his forehead and top of his head and bruises behind his right ear, and that these injuries occurred prior to his death.  The cause of Dillingham's death was a single gunshot wound to the chest.  Beisser testified that the downward trajectory of the bullet indicated that the victim was most likely shot while he was lying down.  The bullet came to rest in the victim's back.  Although medical treatment would not likely have saved

-3-

Dillingham, Beisser testified that Dillingham likely lived for five to ten minutes after being shot and could have called for help in his injured condition.  Officer William Goetz, also with SIU, attended the autopsy of Dillingham and testified at the trial below. Goetz stated that the projectile recovered from Dillingham was a single .22 caliber bullet.

Officer Michael Riddle was assigned as the lead investigator on the case.  During the course of his investigation, Riddle called the phone number next to the name "Cathy" that was found on the note paper in Room 25.  That led him to 291 E. Broadway, the address of Sandra Molinet.  Molinet also testified at the trial below. Molinet stated that she had thrown a party on the night of January 2, 2005, that appellant, Cathy Barnett, Dennis Smith and Kelly Wing attended. She further testified that at this party, nearly everyone was smoking crack cocaine and many people were drinking alcohol.  Molinet stated that Barnett and Wing were both prostitutes whom she knew and Dennis Smith was a friend of hers. She had never met appellant before that night. Molinet stated that that evening, Dennis Smith asked her to put his gun away at her house.  She then placed it in her dresser drawer.  She stated that appellant, Barnett and Dennis Smith were all drinking alcohol and using cocaine at the party and that sometime after midnight appellant and Barnett left together.  Several hours later, they returned to her house. Molinet testified that when appellant and Barnett returned, Barnett did not say a word, which was unusual for her.  Molinet testified that appellant and Barnett left shortly thereafter and she had not seen either of them since.  The next day, Molinet discovered that the gun was missing from her dresser.  When she asked Dennis Smith about it, he said he did not take it and seemed surprised that it was gone.  The next day, Molinet also noticed a bloodied black t-shirt with the word SWAT on it in her basement.  She knew that the shirt belonged to Dennis Smith and, not thinking, she put the shirt in the wash. Subsequently Dennis Smith asked for the shirt.  Molinet also testified that she recalled seeing a law enforcement badge at some point which she believed belonged to Dennis Smith and that she had owned a pair of handcuffs which, approximately one week later, she noticed were missing.

In the course of his investigation, Riddle determined that appellant, Cathy Barnett and Dennis Smith acted in concert in the robbery and murder of Dillingham.  A search of Dennis Smith's black Suburban uncovered two radio-type police scanners, two pairs of handcuffs, and a state of Ohio deputy sheriffs badge.  The badge contained what appeared to be a blood stain on the back.  Subsequent genetic testing revealed that the blood belonged to the victim.

Appellant telephoned Officer Riddle on January 7, 2005, from an unknown location.  Initially he asked Riddle "What's this about?"  Then he said: "We know what this is about." In talking with Riddle, appellant became upset and hung up the phone.

Appellant was subsequently apprehended in Tennessee and transported to Toledo where he was booked into the Lucas County Jail.  At the trial below, the state called Terry Deal to testify.  Deal had met appellant while they were both being transported to Northwest Ohio.  Deal testified that while being transported, appellant indicated he was being sent back to Ohio on a robbery charge and that appellant mentioned $1,300.  He also mentioned that during the robbery someone pretended to be a cop.  Finally, Deal stated that several times he heard appellant say "three people can keep a secret if two are dead."

At approximately 7:00 a.m. on February 5, 2005, appellant gave his first statement to Officer Riddle and Sergeant Maxwell.  That statement was videotaped, which videotape was played for the jury at the trial below. In that interview, appellant initially denied involvement in Dillingham's death, but then admitted that he was involved.  Although he stated that it was Kelly Wing and Dennis Smith's idea to "gank" Dillingham, appellant admitted that he wore the SWAT shirt and had the gun in a holster and the badge.  Appellant stated that Dillingham was waiting for Cathy Barnett but that both Cathy and Kelly Wing initially went into the room.  Cathy then signaled appellant to come in, but, appellant stated, when he entered the room Dillingham did not believe he was a cop.  Appellant stated that Dillingham kept coming at him and that he, appellant, then shot the gun into the mattress.  He even insisted that the officers return to the hotel room to find the bullet.  Appellant told the officers that when he first shot the gun it fell apart, with some of it falling on the floor and some falling on the bed.  He then believed that the gun was broken but, as the fight continued and as Dillingham tried to block the door, Kelly Wing picked up the gun and shot Dillingham.  Appellant stated that although Dennis Smith planned the robbery, he did not recall Dennis Smith being in the room during the assault.  Appellant stated that after Dillingham was shot, Kelly and Cathy collected the money that was on the floor and the group left the scene in appellant's sister's van.  Appellant also drew a sketch during the interview.  The sketch depicted Room 25 at the Crown Inn and noted the placement of the bed, hot tub, victim and the positions of the other people in the room.  After the assault, the group returned to Sandy's house. In his statement to the officers, appellant initially stated that he had been at the Express Motel that night.  After confessing, however, he admitted that he was never at the Express Motel that night.

Two days later, on February 7, 2005, Officers Riddle and Maxwell interviewed appellant a second time at appellant's request.  That interview was also videotaped and the video recording was also played for the jury at the trial below. At that interview, appellant initially stated that he wanted to clarify his statement. He then denied involvement in the crime and stated that everything he had told the officers about the crime in the first interview he learned from Kelly Wing and that he was only in Room 25 at the Crown Inn earlier in the evening partying with Dillingham and the others.

-5-

Also on February 7, 2005, Officer Schriefer returned to Room 25 and searched the mattress more closely.  Schriefer found evidence of a bullet hole going through the mattress.  He then removed the mattress and examined the frame underneath.  There, Schriefer found a partial projectile that was damaged and which he testified looked like a "wad cutter," or practice round.

At the conclusion of the state's case, appellant moved for an acquittal pursuant to Crim.R. 29, 'which motion was denied.  Appellant then presented his case, calling witnesses in an attempt to show that Dennis Smith and Kelly Wing were responsible for the robbery and death of Dillingham.  Then, appellant testified in his own defense. His story differed markedly from the confession that he gave to Officers Riddle and Maxwell.

Appellant testified that he is a tattoo artist who owns either entirely or partially four tattoo shops in Northwest Ohio and Kentucky.  He stated that he has attention deficit hyperactivity disorder ("ADHD") and bipolar disorder and that he takes medication for both.  Appellant testified that on the evening of January 2, 2005, he went to a bar in East Toledo and ran into Kelly Wing, whom he had met the previous August. Kelly then asked him to take her to pick up a friend who was at the Crown Inn.  At the Crown Inn, Kelly went to Room 25, then motioned for him to come to the room.  In the room were Cathy Barnett and Dillingham.  Appellant stated that after partying with them for about 30 minutes he and Kelly left and went to Sandy's house at 291 E. Broadway.  There he met Dennis Smith as well as other individuals.  Appellant testified that eventually Cathy Barnett came to Sandy's house and that at Sandy's, Dennis Smith began talking about dressing up like a cop to commit robberies.  Appellant, Kelly and Cathy then left in his sister's white van and drove to the Express Inn where they met up with a guy named Jake and partied with him.  Shortly thereafter, appellant gave Kelly money to buy more drugs and Kelly left in appellant's sister's white van. Appellant then testified that when Kelly returned, she was upset and was talking about a robbery at the Crown Inn.  Appellant stated that they then returned to Sandy's house where they found Dennis Smith sitting with a stack of bloody money and Dennis and the other people there passing around the gun.  He then went to the basement where he saw Sandy with the bloody t-shirt.

Appellant then testified about his actions after leaving Sandy's house.  Appellant stated the he, Kelly and Cathy left in his sister's van and went to the house of a man named Ted.  While at Ted's, they watched the morning news and saw that a man named Dillingham had been killed at the Crown Inn and that the police were looking for a white Dodge Caravan.  Appellant testified that it was then that Kelly pulled him aside to the bathroom and told him all about the incident. Cathy also became concerned because earlier in the evening she had turned a trick in Room 25 with Dillingham and with his friend Roman Avila.  Appellant and Cathy then decided that they needed to leave town.  Appellant's sister lived in Bowling Green, Kentucky and appellant needed to return her van to her, so over the

-6-

course of several days, appellant and Cathy drove around.  Then, appellant dropped Cathy at a Kroger store in Indianapolis, Indiana. Appellant testified that Cathy had family there.  He then headed for Kentucky, but the van broke down in Louisville.  Appellant spent the next couple of weeks traveling around doing tattoos at various tattoo parlors until he was arrested in Nashville.  Appellant denied that he ever made incriminating statements in the presence of Terry Deal.

Regarding his earlier confession, appellant stated that all the information he gave to Officers Riddle and Maxwell about the crime he learned from Kelly Wing and that he told the officers what he thought they wanted to hear because he thought his life over.  He specifically denied robbing or killing Dillingham and insisted that he was at the Express Motel at the time of the crimes.

On rebuttal, the state recalled Officer Riddle, who testified that he went to the Express Motel to confirm appellant's alibi.  Riddle checked the guest register and learned that neither appellant, nor Cathy Barnett, nor Kelly Wing nor anyone named Jake rented a room on January 2 or 3, 2005.

*State v. Smith* (Oct. 19, 2007), Lucas App. No. L-05-1350. (Exhibit 12.)

## II.  PROCEDURAL HISTORY

### A.    State Conviction

The Lucas County, Ohio Grand Jury indicted Smith, along with two

co-defendants, on one count of Aggravated Murder in violation of Ohio Revised Code §

2903.01(B) and (F) with a firearm specification and one count of Aggravated Robbery in

violation of O.R.C. § 2911.01(A)(1) with a firearm specification.  (Exhibit 1.)  Smith pled

not guilty to the charges in the indictment.  (Exhibit 2.)  Prior to trial, Smith filed a motion

to suppress any and all statements made by him on or about February 5, 2005 and

February 7, 2005.  (Exhibit 3.)  Additionally, Smith filed a motion in limine to prevent the

State from using his video statement because it might mislead or confuse the jury and

its probative value would be outweighed by its prejudicial impact.  (Exhibit 4.)  The court

granted in part and denied in part the motion in limine. Additionally, the court denied in

part and held in abeyance in part Smith's motion to suppress. The suppression hearing

-7-

was continued for an additional day and Smith withdrew the remaining issue of the motion to suppress.  (Exhibits 5 & 6; Exhibit 17.)  A separate jury trial commenced.

When the State rested, Smith moved for a Rule 29 Motion for Acquittal.  The court overruled this motion.  Smith renewed his motion for acquittal after he had presented his case.  That renewed motion was overruled as well.  (Exhibit 7; *see also* Exhibit 18.)

A jury found Smith guilty as charged in the indictment. On October 19, 2005, the trial court sentenced Smith to Life in prison, with parole eligibility after twenty years, for the aggravated murder conviction, consecutive to eight years for the aggravated robbery conviction.  The court merged the two gun specifications and sentenced Smith to three years for the firearm specifications, for an aggregate term of thirty-one years to life.  The Judgment Entry was filed on November 3, 2005.  (Exhibit 8.)

Shortly after the jury verdict, Smith wrote a letter to the court, which it construed as a motion for new trial.  (Exhibit 8A.)  Among other things, Smith stated that Detective Mike Riddle had made a later videotape interview with him.  In the motion, Smith requested a continuance to review this videotape.  The trial court denied the motion and Smith's request for a continuance, but ordered the State to provide Smith with a copy of the videotape.  (Exhibit 12.)

**B.	Direct Appeal**

Smith, represented by Attorney Deborah Kovac Rump, filed a timely notice of appeal on November 9, 2005, to the Sixth District Court of Appeals, Lucas County. (Exhibit 9.)  In his brief, Smith presented the following assignments of error:

1. THE TRIAL COURT ERRED IN NOT GRANTING SMITH'S MOTION TO

-8-

SUPPRESS THE STATEMENTS HE MADE ON FEBRUARY 5 AND FEBRUARY 7, 2005 WHILE IN POLICE CUSTODY.

2. SMITH RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

3. THE TRIAL COURT ABUSED ITS DISCRETION BY GIVING THE JURY A FLIGHT INSTRUCTION.

4. PLAIN ERROR OCCURRED WHEN SMITH'S CONFESSION WAS ADMITTED DUE TO THE ABSENCE OF INDEPENDENT EVIDENCE.

5. THE TRIAL COURT ABUSED ITS DISCRETION THROUGH SEVERAL OF ITS EVIDENTIARY RULINGS, AND THESE DECISIONS IMPACTED SMITH'S ABILITY TO HAVE A FAIR TRIAL.

6. THE TRIAL COURT ERRED BY NOT GRANTING SMITH'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT SMITH WAS CRIMINALLY LIABLE.

7. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

8. THE TRIAL COURT ABUSED ITS DISCRETION BY NOT GRANTING SMITH'S MOTION FOR A NEW TRIAL, OR ALTERNATIVELY, BY NOT GRANTING A BRIEF CONTINUANCE TO ALLOW BOTH PARTIES AN OPPORTUNITY TO FULLY INVESTIGATE AND ARGUE THE MERITS TO THE TRIAL COURT.

(Exhibit 10.)  The State filed a response on December 12, 2006.  (Exhibit 11.)  On October 19, 2007, the Court of Appeals issued a decision and judgment entry overruling all of the assignments of error and affirming the judgment of the trial court. (Exhibit 12.)

Smith, represented by Ohio Public Defender Craig M. Jaquith, filed a timely appeal to the Ohio Supreme Court, on December 3, 2007.  (Exhibit 13.)  In his memorandum in support of jurisdiction, he presented the following propositions of law:

1. THE TRIAL COURT ABUSES ITS DISCRETION WHEN IT OVERRULES DEFENDANT'S MOTION TO SUPPRESS STATEMENTS TAKEN BY POLICE AFTER DEFENDANT REQUESTED TO CONTACT COUNSEL, AND AFTER AN INVOLUNTARY WAIVER OF MIRANDA RIGHTS IS OBTAINED. 5TH AND

14TH AMENDMENTS, U.S. CONST.

2. WHEN THE PERFORMANCE OF TRIAL COUNSEL IS DEFICIENT AND THE DEFENDANT IS PREJUDICED THEREBY, DEFENDANT IS DENIED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL. 6TH & 14TH AMENDMENTS, U.S. CONST.

3. THE TRIAL COURT ABUSES ITS DISCRETION WHEN IT GIVES A FLIGHT INSTRUCTION IN THE ABSENCE OF EVIDENCE OF FLIGHT.

4. A CONVICTION ABSENT PROOF BEYOND A REASONABLE DOUBT OF EVERY ELEMENT OF THE OFFENSE CHARGED DEPRIVES A DEFENDANT OF HER CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW. *Jackson v. Virginia* (1979), 443 U.S. 307; 5th & 14th AMENDMENTS U.S. CONST.

(Exhibit 14.)  The State filed its brief on December 21, 2007.  (Exhibit 15.)  On March 12, 2008, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question.  (Exhibit 16.)

## C.    Federal Habeas Corpus

Smith, through counsel, filed a 28 U.S.C. § 2254 petition for writ of habeas corpus on March 2, 2009, asserting the following grounds for relief:

GROUND ONE: MR. SMITH'S FIFTH AMENDMENT RIGHTS WERE VIOLATED AT TRIAL, AND THE OHIO COURT OF APPEALS UNREASONABLY APPLIED *MIRANDA V. ARIZONA*, AND MADE A RULING CONTRARY TO *EDWARDS V. ARIZONA*, WHEN IT AFFIRMED THE DENIAL OF SMITH'S SUPPRESSION MOTION.
Supporting FACTS: In early February 2005, Mr. Smith was extradited to Lucas County from Tennessee, for the purpose of being custodially interrogated regarding the early January murder of James Dillingham.  Mr. Smith is bipolar, and was deprived of his medication for that condition for 8 days before being interrogated, and spent 3 days in transport from Tennessee to Toledo.  Upon his arrival at the Lucas County Jail, he told staff that he wanted to call his lawyer. Jail staff informed him that Detective Michael Riddle, the lead investigator regarding the murder of James Dillingham, had instructed them not to allow Mr. Smith to use the phone.  Despite Mr. Smith's clear statement that he wanted to talk to his attorney, Detective Riddle interrogated Mr. Smith hours thereafter, having first procured from him a waiver of his Miranda rights.  It is the voluntariness of this waiver that Mr. Smith contests, and the state's failure to honor his request for counsel.

-10-

GROUND TWO: MR. SMITH'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED AT TRIAL, AND THE OHIO COURT OF APPEALS UNREASONABLY APPLIED *STRICKLAND v. WASHINGTON* WHEN IT DETERMINED OTHERWISE.
Supporting FACTS: Mr. Smith's counsel did not request an evaluation as to Mr. Smith's competence 1) at the time of his custodial interrogation, or 2) to stand trial.  The record demonstrates that Mr. Smith's bipolar disorder was untreated for 8 days immediately preceding his interrogation, and that on the transport bus to Lucas County from Tennessee he used his teeth to bite a hole in a bus seat and pull stuffing out through the hole. Further, the incoherent nature of the trial testimony of Mr. Smith demonstrates his lack of competence at trial.

GROUND THREE: THE OHIO COURT OF APPEALS UNREASONABLY APPLIED *JACKSON v. VIRGINIA* WHEN IT DETERMINED THAT THERE WAS SUFFICIENT EVIDENCE TO ALLOW A RATIONAL TRIER OF FACT TO CONVICT MR. SMITH OF AGGRAVATED MURDER AND AGGRAVATED ROBBERY.
Supporting FACTS: No physical evidence or eyewitness testimony linked Mr. Smith to the robbery and murder of James Dillingham.  His convictions were based on his own statements (procured in custody when he had been deprived of psychotropic medication), the statements of a snitch who was being transported with Mr. Smith, and testimony that he associated before and after the crimes with those individuals who committed the crimes.

(Doc. No. 1.)

### III. EXHAUSTION

Respondent asserts that a portion of Ground Two is unexhausted and procedurally defaulted.

AEDPA's exhaustion requirement requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *see also* 28 U.S.C. § 2254(b)(1)(A)(c).  "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. §2254(c).  Thus, state remedies are exhausted either when a petitioner has made proper use of all available state remedies

-11-

for raising claims or when the petitioner has failed to use state remedies but no state remedies giving the right to raise petitioner's claims remain available. *See Coleman,* 501 U.S. at 732.

Respondent argues that Smith failed to fairly present a portion of Ground Two to the state courts. In Ground Two, as presented in his petition, Smith asserts that his trial counsel was ineffective for failing to request a competency evaluation both at the time of his custodial interrogation and at the time of trial. However, in his appeal in the state court, Smith raised the issue of ineffective assistance only with regard to counsel's general failure to challenge Smith's ability to stand trial. Smith does not appear to raise the issue with regard to a specific date or period of time.

In his traverse, Smith argues that appellate counsel raised this issue when she argued that trial counsel was ineffective for failing to request a competency examination and specifically cited as evidence of Smith's incompetence the two videotaped interviews. Smith argues that this was sufficient to put the state on notice that Smith's attorney should have requested a competence evaluation at the time of the interviews.

The arguments of the parties are largely irrelevant, however, in light of the fact that in his traverse, Smith seems to merely be arguing that trial counsel should have requested a competency hearing at some point prior to trial, rather than specifically at the time of the interviews. In his traverse, Smith relies upon the videotaped interviews, just as he did in his state appellate brief. Therefore, Ground Two is reviewed on the merits in Section III of this Report and Recommendation and should not be dismissed as unexhausted or procedurally defaulted.

# IV.  REVIEW ON THE MERITS

## A.    Standard of Review

AEDPA altered the standard of review that a federal court must apply when

deciding whether to grant a writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d)

provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law, as determined
> by the Supreme Court of the United States; or resulted in a decision that was
> based on an unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may

issue only if the state court's decision is contrary to clearly established federal law or is

based on an unreasonable determination of the facts in light of the evidence.  *Carey v.*

*Musladin*, 549 U.S. 70, 74 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000).  Law

is "clearly established" only by holdings of the Supreme Court, not its *dicta*, and the law

must be clearly established at the time of the petitioner's conviction.  *Carey*, 549 U.S. at

74.

Courts must give independent meaning to the phrases "contrary to" and

"unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may
> obtain federal habeas relief with respect to a claim adjudicated on the merits in
> state court.  Under the statute, a federal court may grant a writ of habeas corpus
> if the relevant state-court decision was either (1) "contrary to . . . clearly
> established Federal law, as determined by the Supreme Court of the United

States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05.  A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result.  *Id.* at 405-06.  "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."  *Id.* at 405.  A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand.  *Doan v. Brigano*, 237 F.3d 722, 729-31 (6th Cir. 2001). If a court fails to identify the correct legal principal at issue, the "unreasonable application of" clause does not apply.  *Id.* at 730.

"[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner, however, may rebut "the presumption of correctness by clear and convincing evidence."  *Id.*

**B.     Ground One - *Miranda* Waiver**

In Ground One, Smith asserts that the trial court violated his Fifth Amendment rights when it failed to exclude evidence regarding two videotaped statements Smith made to police.  Smith asserts that his *Miranda* waiver was not voluntary because police coerced him by denying him medication and took advantage of his mental illnesses. The state court of appeals rejected this arguments:

{¶ 29} In his first assignment of error, appellant contends that the trial court erred in denying his motion to suppress the statements that he made on February 5

-14-

and 7, 2005, while in police custody. Specifically, appellant contends . . . that he did not knowingly and competently waive his *Miranda* rights.

* * * *

{¶ 31} Pursuant to the United States Supreme Court's decision in *Miranda v. Arizona* (1966), 384 U.S. 436, a person who is taken into custody or otherwise significantly deprived of his freedom and subjected to interrogation by law enforcement officials must be informed of certain constitutional rights "and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible" as evidence against him. *State v. Treesh* (2001), 90 Ohio St.3d 460, 470.

* * * *

{¶ 36} Appellant . . . asserts that his waiver of his *Miranda* rights was not knowingly and competently given. He contends that when he was first interviewed, he had just arrived in Toledo after spending eight days in transit. He had not slept or eaten for some time and had not been given his medication for his ADHD and bipolar disorders.

{¶ 37} In determining whether an accused knowingly, intelligently and voluntarily waived his *Miranda* rights, the court looks to the totality of the circumstances, including " 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *In re Watson* (1989), 47 Ohio St.3d 86, 90, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. Absent evidence that a defendant's will was overborne and his capacity of self-determination was critically impaired because of coercive police conduct, the decision of a suspect to waive his Fifth Amendment privilege is made voluntarily. *State v. Dailey* (1990), 53 Ohio St.3d 88, 91-92.

{¶ 38} The videotape of the first interview reveals that although appellant appeared slightly agitated at times, he was coherent and alert. In addition, the officers provided appellant with food, coffee and cigarettes. Nothing about appellant's demeanor suggests that he was unable to make decisions for himself or that his will was overborne. Given the totality of the circumstances, it is clear that appellant's waiver of his *Miranda* rights was knowing, intelligent and voluntary. Accordingly, the lower court did not err in denying the motion to suppress and the first assignment of error is not well-taken.

(Exhibit 12.)

The Fifth Amendment provides that "[n]o person. . . shall be compelled in any

criminal case to be a witness against himself."  The privilege against self-incrimination

prohibits the government from using any statement against a criminal defendant

"stemming from custodial interrogation of the defendant unless it demonstrates the use

of procedural safeguards effective to secure the privilege against self-incrimination."

*Miranda,* 384 U.S. at 444.  The admissibility of such a statement depends "on whether

the police provided the suspect with four warnings," specifically, "the right to remain

silent, that anything he says can be used against him in a court of law, that he has the

right to the presence of an attorney, and that if he cannot afford an attorney one will be

appointed for him prior to any questioning if he so desires."  *Dickerson v. U.S.*, 530 U.S.

428, 435 (2000) (quoting *Miranda*, 384 U.S. at 479).  The Supreme Court affirmed that

"*Miranda* and its progeny in this Court govern the admissibility of statements made

during custodial interrogation in both state and federal courts."  *Dickerson*, 530 U.S. at

432.

        Smith argues that his waiver of his *Miranda* rights was not voluntary, citing his

lack of mental competency.  Specifically, Smith maintains that he is bipolar, suffers from

ADHD, and was deprived of his medication for those conditions for eight days prior to

the first interrogation.

        A defendant validly may waive a constitutional right if he does so voluntarily,

knowingly, and intelligently. *Miranda*, 384 U.S. at 444.  By the same token, a defendant

may waive his privilege against self-incrimination and make statements to the police.

Those statements, if voluntary, are admissible at trial. *Colorado v. Connelly*, 479 U.S.

157, 163-64 (1986).  To be voluntary, the waiver must be a free and deliberate choice

rather than a result of intimidation, coercion, or deception and must be made with full

-16-

consciousness of the nature of the right being waived and the consequences attendant to the waiver. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

An assessment of the voluntariness of a statement encompasses the "totality of circumstances" surrounding the confession. *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *United States v. Watson*, 423 U.S. 411, 424 (1976).  If elicited by law enforcement officials by means of psychological coercion, *e.g.*, when their conduct is such as to overbear the accused's will to resist, a statement is not voluntary.  *Miranda*, 384 U.S. at 448; *United States v. Haynes*, 301 F.3d 669, 193 (6th Cir. 2002).

Among the factors to be considered are: whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep; and the use of threats, trickery, or cajolery.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)*; Miranda*, 384 U.S. at 455-58.  However, "coercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary.' " *Connelly, supra*, 497 U.S. at 167; *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000).  A defendant's deficient mental condition, by itself, is insufficient to render a waiver involuntary.  *Id.* at 164-65.  "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Connelly*, 479 U.S. at 165.

In the instant action, Smith argues that police failure to provide him with his prescription medication for ADHD and bipolar disorders amounted to coercion that rendered his *Miranda* waiver involuntary.  Smith cites *Hanna v. Price*, 2005 WL 3088342 (W.D. Mich 2005)(unpublished), in support of this assertion.  In *Hanna*, police

-17-

questioned the defendant while he was in the intensive care unit, following surgery seven or eight hours earlier, and while he suffered from three bullet wounds.  An interrogating officer requested that the defendant's pain medication be withheld "to facilitate communication" during the interview.  The court held that "[t]he withholding of medication from a suspect to facilitate questioning must be considered coercive, regardless of whether the officers informed the suspect of their conduct and implicitly threatened relief if he cooperated.  Any conduct by police that would increase a suspect's pain during the course of questioning must be considered inherently coercive."

The facts of *Hanna* are distinguishable from the instant case.  First, Smith does not allege that he was in any physical pain due to his lack of medication.  Moreover, it is not evident that Smith underwent any significant psychological suffering from his lack of medication.  While it is apparent from the videotape that Smith wanted his medication, it is unclear exactly what the effects of his lack medication were.  Smith does not present evidence of these effects through either his own testimony or by a medical expert.  Instead, both this court and the state courts are forced to rely on observations from videotapes of the interrogations.  As noted by the state court, although Smith appeared agitated from time to time, he was coherent and alert during the interrogations and able to answer questions without difficulty.  This court's observation is that while Smith sometimes speaks with anger and occasionally angst, such conduct does not fall outside the broad range of normal behavior, particularly when taking into consideration that Smith is implicating himself in a murder and robbery.

Moreover, in *Hanna*, the officers specifically requested that the defendant be denied pain medication during the interrogation.  In contrast, Smith alleges he did not have access to his medication for eight days prior to the interrogation and continued to be denied access to these medications for some period of time after the interrogation. When Smith asked for his medications during the interrogations, the interrogating officers told Smith that they were unable to procure his medications and did not know why the jail failed to provide Smith with the medications.  The lack of access to the medication does not appear to be connected with Smith's interrogation at all and no evidence exists in the record that police used the denial of medication as means to coerce Smith.

Finally, the instant case can further be distinguished from *Hanna* by examining the other conditions of the interrogation.  In *Hanna*, the defendant was lying in a intensive care unit hospital bed after surgery in great pain from three bullet wounds and surgery eight hours earlier.  The *Hanna* defendant also had not eaten for days, had tubes in his nose and mouth, and his voice was barely audible over his breathing.  In contrast, Smith does not appear to be suffering any physical pain or injury, is in a typical interrogation room, and provided with cigarettes, food, and coffee during questioning. Although he did arrive at 3:00 a.m. to the county jail and was questioned four hours later at 7:00 a.m., there is no indication in the record of how much Smith slept prior to the interrogation.  Moreover, if Smith had suffered from a lack of sleep, it is unapparent from the videotape.

Smith identifies no other circumstances that amount to police coercion.  Without evidence of coercion, Smith simply does not demonstrate that his waiver of his *Miranda*

-19-

rights was involuntary.  *See Connelly*, 497 U.S. at 167.  Therefore, the state court's analysis was not an unreasonable application of federal law and Ground One lacks merit.

### C.    Ground Two - Ineffective Assistance

In Ground Two, Smith asserts that his trial counsel was ineffective because counsel failed to request a competency evaluation either prior to or during trial.  In order to establish ineffective assistance of counsel, a petitioner must show that counsel's conduct fell so far below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution, and that such deficient performance so prejudiced the defense as to render the proceeding unfair.  *See Strickland v. Washington,* 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.

Deficiencies in counsel's performance must "be prejudicial to the defense in order to constitute ineffective assistance."  *Id.* at 692.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  That is to say, it must be demonstrated that counsel's performance "caused the defendant to lose what he otherwise would probably have won" and that it was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992).

Disagreements by a defendant with tactics and/or strategies will not support a claim of ineffective assistance of counsel; and a petitioner in habeas corpus must overcome a presumption that the challenged conduct of one's counsel was a matter of strategy.  *Strickland,* 466 U.S. at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  Vague or conclusory allegations are insufficient to establish the prisoner's burden that counsel's performance was deficient and that the defendant suffered prejudice as a result.  *See United States v. Cronic*, 466 U.S. 648, 666 (1984) (ineffective assistance of counsel claims can only be made out by pointing to specific errors made by counsel).

In the instant action, Smith asserts that trial counsel was ineffective for failing to request a competency evaluation.  The appellate court applied the two-prong test set forth in *Strickland* and rejected this argument:

{¶ 80} The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed under the Sixth Amendment, and (2) that the deficient performance prejudiced appellant's defense.  *Strickland v. Washington* (1984), 466 U.S. 668, 686-687.  In essence, appellant must show that his trial, due to his attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance.  *Id.* at 693.

{¶ 81} Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel.  *Id.* at 689.  A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155-56, sentence reversed on other grounds *Hamblin v. Mitchell* (C.A.6, 2003), 354 F.2d 482.  Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel.  *State v. Phillips* (1995), 74 Ohio St.3d 72, 85.  Even if the wisdom of an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 48-49.  Finally, reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel

-21-

will often defend the same case in different manners. *Strickland, supra* at 689; *State v. Keenan* (1998), 81 Ohio St.3d 133, 152.

{¶ 82} On the issue of appellant's competency, the Supreme Court of Ohio has held that "[t]he term 'mental illness' does not necessarily equate with the definition of legal incompetency." *State v. Berry* (1995), 72 Ohio St.3d 354, syllabus. The court in *Berry* further stated at 359: "In *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825, the United States Supreme Court set forth the test to determine whether a defendant is competent to stand trial, stating that ' * * * the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.' " * * * The right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." (Citations omitted.)

{¶ 83} At the trial below, appellant testified in his own defense and stated that although he has ADHD and bipolar disorders, he takes medication for those disorders and prefers Neurontin because it allows him to function. Although appellant's trial counsel allowed him to ramble on about the events of January 2 and 3, 2005, nothing in appellant's testimony or in his videotaped statements previously given to police indicates that he did not understand the proceedings against him or was unable to assist in his defense. We therefore cannot say that appellant's trial counsel was ineffective for failing to request a competency evaluation.

(Exhibit 12.)

As conceded by Smith, the appellate court employed the appropriate federal law in its determination that the failure to request a competency hearing did not amount to ineffective assistance of counsel. The Supreme Court has set forth the standard for determining whether or not a defendant is competent as whether he or she "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960); *Drope v. Missouri*, 420 U.S. 162, 172 (1975). Further, counsel is ineffective for failing to request

a competency hearing only where indications of incompetency are strong and reasonable probability exists that, but for counsel's deficient performance in this regard, the petitioner would have been found incompetent to stand trial. *See, e.g., Hull v. Kyler*, 190 F.3d 88, 106 (3rd Cir.1999).

In the instant action, although Smith suffers from mental illness,  the videotaped interviews and Smith's trial testimony do not demonstrate that Smith lacked the ability to consult with his lawyer with a reasonable degree of rational understanding in preparation for trial or that he lacked an understanding of the proceedings against him. Not every manifestation of mental illness demonstrates incompetency to stand trial. Neither low intelligence, mental deficiency, nor the fact that a defendant has been treated with anti-psychotic drugs can automatically be equated with incompetence. *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000); *Miles v. Dorsey*, 61 F.3d 1459, 1474 (10th Cir. 1995); *Hastings v. Yukins*, 194 F.Supp.2d 659, 671-672 (E.D.Mich. 2002).  Major depression, generalized anxiety, or borderline personality disorders do not necessarily show that a defendant is unable to consult with his or her lawyer or is incapable of understanding the proceedings against him or her.  *United States v. Teague*, 956 F.2d 1427, 1432 (7th Cir.1992).  Nor will every suicide attempt create a bona fide doubt concerning a defendant's competency to stand trial.  *Hastings*, 194 F.Supp.2d at 672.

Smith generally cites his mental illness, the videotaped interview, and his trial testimony as support for the assertion that his attorney should have requested a competency evaluation.  Smith asserts that his manic characteristics, namely, "grandiosity, excessive talkativeness, flight of ideas, abrupt changes from on topic to

another," would have alerted competent counsel to need for a competency exam.  While Smith testified to his mental illness and he was certainly voluble at times during both the interviews and trial, this allegedly manic behavior does not establish that Smith was incapable of assisting in his defense or understanding the proceedings against him. Smith is able to answer questions, does not appear to be confused or disoriented, and does ramble anymore than a typical, nervous defendant on trial for murder would. Nothing Smith said in the interview or at trial demonstrates a reasonable probability that the trial court would have determined Smith to have been incompetent.

Thus, trial counsel's failure to request a competency evaluation at any point of the proceedings does not amount to ineffective assistance of counsel.  The appellate court did not unreasonably apply federal law in failing to find that Smith's trial counsel was ineffective for not requesting a competency hearing.  As such, Ground Two lacks merit.

### D.    Ground Three

In Ground Three, Smith asserts that the State did not present sufficient evidence to support a conviction of aggravated murder and aggravated robbery.

The state appellate court held that sufficient evidence exists to support Smith's convictions:

{¶ 66} We will next address the sixth and seventh assignments of error together. Appellant asserts that because the verdict was not supported by sufficient evidence, the trial court should have granted his Crim.R. 29 motion for acquittal. Appellant further asserts that the verdict was against the manifest weight of the evidence.

{¶ 67} The Supreme Court of Ohio has ruled that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."  *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386.

-24-

"Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. *Id.* Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.  Under a manifest weight standard, however, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. *Thompkins, supra* at 387.  The appellate court, "'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'"  *Id.*, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶ 68} Appellant was convicted of violating R.C. 2911.01(A)(1), aggravated robbery, and R.C. 2903.01(B), aggravated murder.  The aggravated robbery statute reads in relevant part:

> {¶ 69} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

> > {¶ 70} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶ 71} The aggravated murder statute provides:

> {¶ 72} "(B) No person shall purposely cause death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *."

{¶ 73} Upon a review of the evidence submitted at the trial below, we must conclude that there was sufficient evidence to find appellant guilty of aggravated robbery and aggravated murder and that the convictions were not against the manifest weight of the evidence.  Through his confessions, appellant demonstrated an intimate knowledge of the crime scene.  In addition, statements made by appellant, such as "The dude never should have come at me," and "I

guess I just confessed," were particularly damning.  Appellant also admitting to wearing the SWAT shirt and holding the badge and gun.  He even admitted to firing the gun at the victim while the victim was on the bed and insisted that the officers return to the hotel room to find the bullet that went into the mattress.  Appellant further insisted that Kelly Wing shot the victim while the victim stood in the doorway.  Forensic evidence, however, in the form of the bullet's trajectory revealed that the victim was most likely shot while he was lying down.  Finally, evidence revealed that the victim had recently been paid $1,400 and had a large amount of cash on him the evening of January 2, 2005.  When he was discovered almost immediately after his death, however, he only had $89.12.

{¶ 74} In view of the all of the evidence presented at the trial below, we cannot say that the verdicts were unsupported by the evidence or were against the manifest weight of the evidence and the sixth and seventh assignments of error are not well-taken.

(Doc. No. 12.)

The due process clause of the Fourteenth Amendment requires that a criminal conviction be based upon proof beyond a reasonable doubt as to every fact necessary to constitute the offense charged.  The standard for determining sufficiency of the evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

The Supreme Court reemphasized the deference federal courts are to give factual determinations in state court convictions in *Wright v. West*, 505 U.S. 277, 296 (1992).  In that case, the Court stated that "[i]n *Jackson*, we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review."  *Id.*  This standard of review does not permit the federal habeas court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts.

-26-

*Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Any conflicting inferences arising from the record . . . should be resolved in favor of the prosecution."  *Heinish v. Tate*, 9 F.3d 1548, 1993 WL 460782 (6th Cir.1993) (unpublished) (citing *Walker*, 703 F.3d at 969-70).

In his petition, Smith argues that evidence outside of his admissions made during the interviews of February 5 and 7, 2005 suggest only a possibility that he participated in the robbery and killing of the victim and are insufficient to support conviction. However, as explained previously in this Report and Recommendation, Smith's admissions were voluntary and thus, admissible as evidence during his trial.  Therefore, any review of the evidence presented should include Smith's self-incriminating statements.

Smith next argues that Smith's statements during the interviews were unreliable because he was sleep-deprived and not taking his medication for his bipolar disorder. Smith asserts that no reasonable person would rely on statements made under these circumstances.  However, a federal court reviewing a petition for a writ of habeas corpus has no authority to reassess the credibility of witnesses or re-weigh the evidence.  *Herrera*, 506 U.S. at 401-02.

Finally, Smith maintains that his statements during the interviews demonstrate only that he had "intimate knowledge" of the facts, not that he perpetrated the crimes at issue.  Smith ignores in his analysis his statements cited by the state court that "The dude never should have come at me," and "I guess I just confessed."  Moreover, Smith admitted to carrying a gun and firing it at the victim while he was lying on the bed.  And although Smith stated that another person shot the victim while the victim stood in the doorway of the room, forensic evidenced showed that the victim was most likely shot

-27-

while lying down.  In addition, the victim was missing a large sum of cash that he was known to have earlier in the day.  In light of this evidence, the state court's decision that sufficient evidence supports Smith's convictions is not an unreasonable application of federal law.  Therefore, Ground Three lacks merit.

## IV.  CONCLUSION

For the forgoing reasons, the Magistrate Judge recommends that petition be denied.


Date:  January 8, 2010                                        /s/ *Nancy A. Vecchiarelli*
                                                                      United States Magistrate Judge



## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**